# EXHIBIT G

OPERATING AGREEMENT

OF

SWEET MICKY, LLC

THIS OPERATING AGREEMENT (this "Agreement") of Sweet Micky, LLC, a Delaware limited liability company (the "Company"), is entered into as of January 1, 2014 (the "Effective Date").

SECTION 1
DEFINITIONS

1.1 *Specific Definitions.* As used in this Agreement:

(a)  "Act" shall mean the Delaware Limited Liability Company Act.

(b)  "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)  The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)  The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(c)  "Allocation Percentage" shall mean, for each Member, the percentage set forth on *Schedule A (as it may be adjusted pursuant to the terms of this Agreement)*. The Allocation Percentages of the Members shall be adjusted to reflect a revaluation of such Members' Capital Accounts in accordance with Section 1.1(d)(iv).

(d)  "Capital Account" shall mean, for each Member, a separate account that is:

(i)  Increased by: (A) the amount of such Member's Capital Contribution and (B) allocations of Profits to such Member pursuant to Section 4;

(ii)  Decreased by: (A) the amount of cash distributed to such Member by the Company; (B) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (C) allocations of Losses to such Member pursuant to Section 4;

(iii)  Otherwise adjusted in accordance with the provisions of this Agreement; and

-1-

EXHIBIT

3

5-16-17

PENGAD 800-631-6989

CONFIDENTIAL

(iv)    Revalued in connection with any event described in Section 1.1(n)(i) to the extent the Managers determine that a revaluation is necessary to preserve the economic arrangement of the Members. In determining the amount of any liability for purposes of Section 1.1(b)(i) and Section 1.1(b)(ii), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

(v)    Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

(e)  "Capital Contribution" shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

(f)  "Class A Member" means a Member identified as a Class A Member on Schedule A.

(g)  "Class B Member" means a Member identified as a Class B Member on Schedule A.

(h)  "Close of Business" shall mean 5:00 PM ET.

(i)  "Code" shall mean the United States Internal Revenue Code of 1986, as amended.

(j)  "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

(k)  "Dissolution" or "Dissolved" shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

(l)  "Fiscal Period" shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

(m) "Fiscal Year" shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

(n) "Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

-2-



CONFIDENTIAL                    SM_000355

(i)     The Gross Asset Value of all Company assets shall be adjusted to equal their respective Fair Market Values, immediately prior to the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; (C) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a member; and (D) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (A), (B) and (C) of this sentence shall be made only if the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(ii)     The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

(iii)     If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section 1.1(n)(i) or Section 1.1(n)(ii), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(o)     "Gross Receipts" shall mean all non-returnable, non-forfeitable sums received by or on behalf of and/or credited to or on behalf of the Company from all forms of exploitation and the disposition of the Picture, and any allied and ancillary rights therein (for the avoidance of doubt, not including subsequent or derivative production rights revenue other than revenue received in connection with the licensing of such rights as part of the underlying rights of a subsequent or derivative production) owned or controlled by the Company, net of taxes and bank transfer fees, including, without limitation, the net amount of any audit settlements and tax credit proceeds in excess of monies required to repay any tax credit loan); provided that such audit settlements and proceeds shall not be subject to sales fees or union residuals reserve.

(p)     "Interest" shall mean, for each Member, the entirety of such Member's rights, duties and interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-a-vis third parties, or receive distributions as well as such Member's obligation, if any, to provide services, make Capital Contributions or take any other action.

(q)     "Majority-In-Interest of the Members" shall mean a group of Members whose aggregate Allocation Percentages at the time of determination exceed fifty percent (50%) of the total Allocation Percentages of all the Members at such time; "Majority-In-Interest of the Managers" shall mean a group of Managers who, at the time of determination, exceed fifty percent (50%) of the total Managers at such time.

(r)     "Member" shall mean those Persons admitted as members under this Agreement as shown on *Schedule A* as such schedule may be updated from time to time. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

(s)     "Member Nonrecourse Deduction" shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

(t)     "Minimum Gain of the Company" or "Company Minimum Gain" shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal

-3-

SM_000356

income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

(u)   "Person" shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

(v)   "Picture" shall mean the full length documentary feature film tentatively named "Sweet Micky for President".

(w)   "Profits and Losses" shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(i)   Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)   Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)   In the event that the Gross Asset Value of any Company asset is adjusted in accordance with Section 1.1(n)(i) or Section 1.1(n)(ii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)   Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(v)   In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(vi)   Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 4.2 or Section 4.3 shall not be taken into account in computing Profits or Losses.

(x)   "Securities" shall mean debt, equity and synthetic securities of any type.

(y)   "Termination" shall mean, with respect to a legal entity other than a natural person, that such entity has Dissolved, completed its process of winding-up and liquidation, and otherwise ceased to exist.

(z)   "Transfer" shall mean any sale, exchange, transfer, gift, assignment, pledge, mortgage, lien, change, claim, security interest, hypothecation or other disposition or encumbrance of any sort, whether voluntary or involuntary.

-4-



CONFIDENTIAL

SM_000357

(aa) "Treasury Regulations" shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

(bb) "Unreturned Capital Contribution" shall mean with respect to a Member, such Member's aggregate Capital Contributions reduced by the amount of cumulative distributions made pursuant to Sections 1.1(a)(i)(A) and 5.1(a)(ii).

(cc) Updated Capital Account shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

1.2   *General Usage*.  The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  Except where the context clearly requires to the contrary:

(a)  Instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity;

(b)  The word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation";

(c)  References to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the Effective Date of this Agreement) and shall include all successor rules and instruments thereto;

(d)  References to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations;

(e)  References to (i) "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format, (ii) "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof, and (iii) "$" or "dollars" shall mean the lawful currency of the United States; and

(f)  The meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States.

SECTION 2
FORMATION

2.1 *Formation and Name*.

(a)  The Members hereby enter into and form the Company as a limited liability company in accordance with the Act.

(b)  The name of the Company shall be "Sweet Micky, LLC".

-5-



CONFIDENTIAL

SM_000358

2.2 *Term.* Upon the execution of this Agreement, the "Term" of the Company shall commence as of the date first above written and shall continue until the Company is Dissolved pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be Dissolved.

2.3 *Purpose and Scope.* Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Members.

2.4 *Principal Office.* The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office may be changed from time to time by the Managers upon notice to the Members.

2.5 *Delaware Office and Agent.*

(a) The Company shall maintain a Delaware registered office and agent for service of process as required by the Act. The registered agent shall initially be Registered Agent Solutions, Inc. and the registered office of the Company shall initially be located at 1679 South Dupont Highway, Suite 100, Dover, DE, 19901, and may thereafter be changed from time to time by the Managers upon notice to the Members.

(b) In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

2.6 *Admission of Members.* Each Person that has executed this Agreement and whose name is listed under Name and Contact Information on *Schedule A*, as such *Schedule A* may be updated from time to time by the Members, is hereby admitted as a Member, as indicated on such Schedule.

2.7 *Names, Contact and Other Information of the Members.* Set forth below the name of each Member on *Schedule A* shall be appropriate contact information for such Member (including such Member's mailing address, telephone number, and email address, as well as, in the case of a Member that is an entity, the name or title of an individual to whom notices and other correspondence should be directed). Each Member shall promptly provide the Company with the information required to be set forth for such Member on *Schedule A* and shall thereafter promptly notify the Company of any change to such information.

2.8 *Additional Documents.* With the prior approval of the Members, the Managers shall cause to be executed, filed, recorded, published, or amended any documents, as the Managers in their reasonable discretion determine to be necessary or advisable: (a) in connection with the formation, operation, Dissolution, winding-up or Termination of the Company pursuant to applicable law; or (b) to otherwise give effect to the terms of this Agreement. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

2.9 *Title to Property.* Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

-6-

CONFIDENTIAL

SM_000359

SECTION 3
CAPITALIZATION

3.1 *[Reserved]*.

3.2 *Capital Contributions.* Except to the extent set forth on *Schedule A* or provided in Section 3.8, all Capital Contributions shall be in cash.

(a) *Capital Contributions in Respect of Initial Capital Commitments.* Each Member has contributed capital to the Company in the amount reflected in the books and records of the Company. In the event that at any time the Managers determine that additional funds are required by the Company, the Managers may request that each Member make an additional Capital Contribution and each Member shall have the right, but not the obligation, to contribute its Allocation Percentage of the requested amount. If one Member contributes less than its Allocation Percentage, the other Member shall have the right, but not the obligation, to contribute the shortfall amount. Any additional Capital Contributions by a Member made pursuant to this Subsection shall be credited as contributions of capital to the Company and become a part of the Capital Account of such Member on the date of such contribution.

3.3 *Limitation on Capital Contributions.* Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

3.4 *[Reserved]*

3.5 *Withdrawal and Return of Capital.* Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Members, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's interest.

3.6 *Loans to the Company.* No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness. In the event that at any time the Managers determine that additional funds are required by the Company, the Managers, acting for and on behalf of, and in the name of, the Company, shall have the right, but not the obligation, to cause the Company to borrow such additional funds from commercial banks, savings and loan associations and/or other lending institutions or other persons (including Members).

3.7 *Interest on Capital.* No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance or share of unallocated Profits.

3.8 *Limitation of Liability; Return/Withholding of Certain Distributions.*

(a) Except as otherwise required by applicable law, a Member shall have no personal liability for the debts and obligations of the Company.

(b) A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by any Member. The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c) Nothing in this Section 3.8 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations

-7-

 

CONFIDENTIAL                    SM_000360

pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

## SECTION 4
### PROFITS AND LOSSES

4.1 *Allocations of Company Profits and Losses.* Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a) Profits shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii);

(ii) Second, among the Members in proportion to their Allocation Percentages.

(b) Losses shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse allocation of Profits for prior Fiscal Periods under Section 4.1(a)(ii) and Section 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Section 4.1(a)(ii) and Section 4.1(a)(ii), provided that no Losses shall be allocated to a Member pursuant to this Section 4.1(b)(i) to reverse Profits to the extent that such Member has already received distributions pursuant to Section 5.1 with respect to such Profits; and

(ii) Second, among the Members in proportion to their Allocation Percentages.

4.2 *Allocation Adjustments Required to Comply With Section 704(b) of the Code.*

(a) *Limitation on Allocation of Losses.* If an item of Losses otherwise allocable to a Member under Section 4.1(a) would cause such Member to have an "Adjusted Capital Account Deficit" at the end of any Fiscal Year (or increase the amount of such Member "Adjusted Capital Account Deficit"), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i) To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii) Next to the Members as a group, in proportion to their respective Allocation Percentages, as determined in the reasonable discretion of the Managers.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Section 4.2(f) or Section 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b) *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of

-8-



CONFIDENTIAL

Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the "Adjusted Capital Account Deficit" of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an "Adjusted Capital Account Deficit" after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c) *Gross Income Allocation*. In the event any Member has an "Adjusted Capital Account Deficit" at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in the Agreement.

(d) *Member Nonrecourse Deductions*. In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e) *Minimum Gain Chargeback.* This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2. In general, upon a reduction of the Company's Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.6, are allocable to increases in the Company's Minimum Gain. Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Managers determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, such Members shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f) *Intent of Regulatory Allocations*. The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code. The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.2(f). Accordingly, the Managers are hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Managers determine is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

4.3 *General Allocation and Capital Account Maintenance Provisions.*

(a) *Book - Tax Accounting Disparities*. If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference

-9-

CONFIDENTIAL

into account in accordance with Section 704(c) of the Code and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Managers.

(b) *Allocations in Event of Transfer.* If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Managers and permitted under Section 706 of the Code.

(c) *Adjustment to Capital Accounts for Distributions of Property.* If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d) *Tax Credits and Similar Items.* Any tax credits or similar items not allocable pursuant to Section 4.1, Section 4.2 and Section 4.3(a), Section 4.3(b) and Section 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages. Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) *Reallocation of Certain Losses.* To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.8(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

(f) *Tax Allocations.* It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in a manner that is consistent with the requirements of the Code and the Treasury Regulations.

4.4 *Nonallocation of Distributions to Increases in Minimum Gain.* To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company's Minimum Gain. In general, and except as provided in such Treasury Regulation, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

4.5 *Allocation of Liabilities.* Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

4.6 *Modifications to Preserve Underlying Economic Objectives.* In the event that (a) there is a change in the federal income tax law, (b) the Company borrows money or property or (c) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Managers, acting in their reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the

-10-

CONFIDENTIAL

SM_000363

allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

4.7  *Withholding Taxes.*

(a)  The Company shall withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Managers in their reasonable discretion). Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Managers as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b)  If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c)  Each Member hereby agrees to indemnify the Company and the other Members for any liability they may incur for failure to properly withhold taxes in respect of such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of over-withholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

4.8  *Intent of Allocations/Cash Savings Clause.*  The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(a). To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (a) such provisions shall be amended by the Managers if and to the extent necessary to produce such result and (b) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Managers among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Managers. This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority. The Managers shall have the power to amend this Agreement without the consent of the other Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8. To the extent that after making the allocations and adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(a), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been

-11-

CONFIDENTIAL                    SM_000364

reduced) to the extent such payment does not violate the requirements of Sections 514(c)(9)(E) and 704(b) of the Code or may take such other action as reasonably determined by the Managers to offset such reduction.

## SECTION 5
## DISTRIBUTIONS

5.1 *Distributions.* Except as otherwise provided in this Agreement, distributions prior to the Dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(a) *Discretionary Distributions.* The Managers at least once annually shall determine in Managers' reasonable judgment to what extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs). To the extent such cash is available, the Managers shall cause the Company to distribute such excess cash and any property available for distributions in the following order and priority:

(i)     Gross Receipts shall be distributed:

(A) First, to the repayment of outstanding debt, if any;

(B) Second, to the payment of collection fees and expenses charged by the collection agent for the Picture;

(C) Third, to any foreign sales expenses, foreign sales fees and domestic sales and distribution legal fees;

(D) Fourth, to the payment of all union residuals payable to all guilds and unions, including, without limitation, IATSE and SAG, in connection with the exploitation of the Picture, to the extent such residuals are not assumed or paid by any third party distributor of the Picture;

(E) Fifth, to any distribution, business and marketing expenses directly related to the Picture or the Company that are not included in an approved budget and not assumed or paid by any third party distributor of the Picture (including, without limitation, any unbudgeted delivery materials required to be delivered to distributors of the Picture);

(F) Sixth, in the event that any Member has a Capital Contributions balance that is greater than the Capital Contributions balance of any other Members, then to such Member who contributed more than the others until all Capital Contributions balances are equal;

(G) Seventh, among the Members in proportion to their Unreturned Capital Contributions until the Unreturned Capital Contributions of the Members are reduced to zero; and

-12-

CONFIDENTIAL

SM 000365

(H) Thereafter, among the Members and all other third party participants entitled to a percentage thereof, with the portion going to the Members paid in proportion to the Members' respective Allocation Percentages.

(ii)     All cash available for distribution other than from Gross Receipts shall be distributed:

(A) First, in the event that any Member has a Capital Contributions balance that is greater than the Capital Contributions balance of any other Members, then to such Member who contributed more than the others until all Capital Contributions balances are equal;

(B) .

(C) Second, among the Members in proportion to their Unreturned Capital Contributions until the Unreturned Capital Contributions of the Members are reduced to zero; and

(D) Thereafter, among the Members in proportion to the Members' respective Allocation Percentages.

(b)  *Tax Distributions.*

(i)     Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. If the Company is not required to file a federal income tax return for a Fiscal Year or the Company's federal income tax return for such Fiscal Year has not been completed by the Close of Business on the 85th day after the close of such Fiscal Year, the amounts to be shown on such return for purposes of this Section 5.1(b)(i) shall be determined in good faith by the Managers.

(ii)     For purposes of this Section 5.1(b), the "Tax Percentage" shall equal forty two percent (42%) with respect to net taxable income or net short term capital gains and twenty two percent (22%) with respect to net long term capital gains. The Managers may adjust the determination of the Tax Percentage to reflect a change in law or rates.

(iii)     For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(b)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(b)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(b)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(b)(i) in respect of such prior Fiscal Year or Years). Further, distributions made in respect of this Section 5.1(b) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(a) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year or Years).

(iv)     At the election of the Managers, no distribution shall be required pursuant to Section 5.1(b)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

-13-

CONFIDENTIAL

SM_000366

(v) No distribution shall be required to be made pursuant to this Section 5.1(b) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi) The Company shall not make a distribution under this Section 5.1(b) to a Member to the extent such Member's Interest is being redeemed or in connection with a liquidation of the Company.

(c) *Source of Items Available for Distribution.* In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Managers in their reasonable discretion.

5.2 *Limitation on Distributions.* No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would: (a) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (b) cause the Company to be insolvent; or (c) render the Member liable for a return of such distribution under applicable law.

## SECTION 6
## ADMINISTRATION

6.1 *Management Committee.* The Company will be managed by a management committee ("Management Committee") of managers (each a "Manager"). In accordance with the terms of this Agreement, the Managers shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

(a) *Election and Tenure of the Managers.*

(i) The Class A Members shall be entitled to elect one Manager (the "Class A Manager") and the Class B Members shall be entitled to elect one Manager (the "Class B Manager"). The initial Class A Manager shall be Suki Sohn and the initial Class B Manager shall be Barry R. Bekkedam. All elections of Managers shall be by Majority Vote voting separately as a Class. Each Manager shall exercise the rights of a Manager under this Agreement until he or she resigns as a Manager or is removed pursuant to the terms hereof. No Manager shall have any contractual right to such position.

(ii) Any vacancy occurring in the Managers may be filled by election at an annual or special meeting of the Members of the applicable Class called for that purpose. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(iii) At any meeting of Members of the applicable Class, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without Cause, by a Majority Vote of the applicable Class of Members. Any Manager so removed shall be paid all accrued but unreimbursed expenses to which such Manager is entitled pursuant to the terms of this Agreement as of the effective date of such removal. *Duties of Managers.*

-14-



CONFIDENTIAL

SM_000367

(i)    Each Manager must discharge his, her or its duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager reasonably believes to be in the best interests of the Company.

(ii)    Managers may rely on information received from other persons if that reliance is consistent with the Managers' duties under Section 6.1(b)(ii).

6.2 *Managers' Power to Bind the Company.*

(a)    Notwithstanding any provision of this Agreement to the contrary, any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by the Managers shall be deemed to have been duly executed by the Company upon the prior unanimous approval (or Majority approval in the event of the appointment of a third Manager under Section 6.11) of the Managers; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Managers' power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b)    The Managers are hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Managers' power to bind the Company as set forth in Section 6.1(a).

6.3 *Action by Members.* To the extent that any act or matter requires the vote of the Members, and except as may be otherwise specifically provided herein, such vote shall be by Majority-In-Interest of the Members.

6.4 *Duties to the Company.* Each Member shall devote to the Company such time, effort and services as are consistent with such Member's duties under this Agreement.

6.5 *Member Expenses.*

(a)    *General.*   Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b)    *Managers.* The Managers shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by such Managers on behalf of the Company, with the approval of the Members, which approval may be withheld by the Members in their absolute discretion.

(c)    *Members.* Members shall be reimbursed for reasonable expenses incurred on behalf of the Company.

6.6 *Tax Matters Partner.*

(a)    *General.* Onslot Films LLC is hereby designated the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code. Except to the extent specifically provided in the Code or the Treasury Regulations (or the laws of relevant non-federal taxing jurisdictions), the tax matters partner shall have exclusive authority to act for or on behalf of the Company with regard to tax matters, including the authority to make (or decline to make) any available tax elections.

(b)    *Partnership Classification for Tax Purposes.* Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election

-15-



or similar administrative procedure), the tax matters partner shall cause the Company to take the position that the Company is a "partnership" for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position. A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(c) *Notice of Inconsistent Treatment of Company Item*. No Member shall file a notice with the United States Internal Revenue Service under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return unless such Member has, not less than thirty (30) days prior to the filing of such notice (or such shorter period as is approved by the tax matters partner in its sole and absolute discretion), provided the tax matters partner with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the tax matters partner shall reasonably request.

(d) *Notice of Settlement Agreement*. Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the tax matters partner of such settlement agreement and its terms within sixty (60) days after the date thereof.

6.7 *Records and Financial Statements*.

(a) The Company shall maintain true and proper books, records, reports and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Copies of such books, records, reports, accounts and schedules shall be located at the Principal Office and shall be available to any Member for inspection and copying, upon at least two (2) business days' notice, during reasonable business hours; provided, however, that items of highly confidential Company information may be withheld from a Member to the extent reasonably necessary to protect Company interests as determined by the Managers in their sole discretion; and provided, further, that confidential communications between the Company and its legal counsel relating to an actual or potential controversy or claim between the Company and a Member may be withheld from such Member as determined by the Managers in their sole discretion.

(b) Within ninety (90) days after the end of each Fiscal Year, the Company shall furnish to each Member a statement, which need not be audited, of: (i) the assets and liabilities of the Company, (ii) the net Profits and Losses of the Company, and (iii) the Capital Account balance of such Member. In addition, within ninety (90) days after the end of each Fiscal Year, the Company shall supply all information reasonably necessary to enable the Members to prepare their federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law.

6.8 *Valuation of Company Assets*.

(a) *General*. The Managers shall make a good faith determination of the value of the Company's assets in connection with any allocation pursuant to Section 6.8(b) or Section 8.2(b), as required pursuant to Section 4.3(c), upon the Dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Managers.

(b) *Binding Effect*. The value of any Company asset or interest determined pursuant to this Section 6.8 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or interest for all purposes under this Agreement.

-16-

CONFIDENTIAL

6.9 *Indemnification of Managers.* If a Manager incurs a liability in respect of a claim relating to the business or internal affairs of the Company, then, with the affirmative vote of a majority of the other Members, the Company may indemnify the Manager for the liability to the extent not prohibited by the Act. For purposes of this Section 6.9, a liability means any obligation to pay a judgment, settlement, penalty, fine or reasonable expense (including attorneys' fees) in respect of a claim described in this Section 6.9.

6.10   *Confidential Information.*

(a) *General.* Except as otherwise provided in this Agreement, at all times that any person is a Member or Manager and all times thereafter, without limitation, each person who is or was a Member or Manager shall keep (and shall take all reasonable steps and measures to cause his or her Affiliates to keep) in strictest confidence all information relating to the business, affairs and operations of the Company, including, without limitation, the Company's costs of performing services and selling products, methods or procedures, developments, trade secrets, ideas, formulae, concepts, writings, inventions and/or improvements, whether patented, patentable or unpatentable, and any copyrightable matter, which the Company has or may conceive of, jointly or solely, or develop, or reduce to practice, or cause to be conceived, or developed, or reduced to practice along the lines of the Company's business or any part thereof (collectively, the "Proprietary Information"). During such period and at all times thereafter, each Member and Manager shall not publish, communicate, divulge, disclose or use, whether or not for his or her own benefit, any such Proprietary Information without the prior written consent of the Company, and shall make available and disclose all such Proprietary Information to the Company upon request and without charge.

(b) Any and all of the Proprietary Information shall be and the remain the sole and exclusive property of the Company, and all of each Member's or Manager's right, title and interest, if any, in and to any of the Proprietary Information are hereby assigned and transferred in their entirety to the Company.

(c) Each Member and Manager acknowledges that its covenants hereunder to turn over and disclose to the Company and refrain from using or disclosing to others any of the Proprietary Information are of a special, unique and extraordinary character, which gives this Agreement a peculiar value to the Company, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and a breach by any Member of any of these provisions will or could cause the Company irreparable injury. It is, therefore, expressly acknowledged and agreed that this Agreement, and specifically including the aforementioned provisions, may be enforced by the Company by preliminary and permanent injunction and other equitable remedies, without the requirement of the Company posting any bond or collateral thereon or in connection therewith (any such requirement is hereby waived by each Member and Manager). Such relief shall not be exclusive, but shall be in addition to any other rights or remedies the Company may have for such breach, and the Company shall be entitled to recover all costs and expenses, including reasonable attorneys' fees incurred by reason of any breach of the covenants of this Agreement

6.11   *Deadlocked Managers.* In the event that the Managers cannot agree on any matter related to the conduct of the Company's business, the Managers shall confer in good faith in order to resolve such deadlock. If the deadlock is not resolved to the satisfaction of the Managers within a period of thirty (30) days, the Managers shall then mutually appoint a neutral third party, who shall act as a Manager of the Company for the sole purpose of casting a tie-breaking vote on the specific matter and whose term of office shall expire immediately upon doing so.

-17-

**CONFIDENTIAL**

SM_000370

## SECTION 7
### TRANSFERS AND WITHDRAWALS

7.1 *Transfers of Interests*. Unless authorized by the Majority-in-interest of the Members, no Member shall Transfer all or any portion of its Interest.

7.2 *Withdrawal/Removal of a Member*. Unless authorized by the Majority-in-interest of the Members, no Member shall withdraw from the Company or otherwise cease to be a Member, except in connection with the Dissolution of the Company.

## SECTION 8
### DISSOLUTION AND LIQUIDATION

8.1 *Dissolving Events*. The Company shall be Dissolved upon the occurrence of any of the following events:

    (a)  Permanent cessation of the Company's business;

    (b)  Vote to dissolve the Company by the Members whose aggregate Allocation Percentages equal or exceed seventy five percent (75%) of the total Allocation Percentages of all the Members; or

    (c)  Any other event which results in a mandatory Dissolution of the Company under the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial Dissolution of the Company for reasons other than those listed in Section 8.1(a) and Section 8.1(b).

8.2 *Winding Up and Liquidation*.

    (a)  Upon Dissolution of the Company, the Managers shall promptly wind up the affairs of, liquidate and Terminate the Company.  In furtherance thereof, the Managers shall: (i) have all of the administrative and management rights and powers of the Managers (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs.  Following Dissolution, the Company shall sell or otherwise dispose of assets determined by the Managers to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation.  At the conclusion of the winding-up and liquidation of the Company, the Managers shall: (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of termination or similar document to effect the termination of the Company under the Act and other applicable laws.

    (b)  Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Members.  Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.8 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law.  Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

    (c)  The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4.  If any property is to be

-18-



distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d) The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i) First, to repay any indebtedness of the Company, whether to third parties or the Members, in the order of priority required by law;

(ii) Next, to any reserves which the Members reasonably deem necessary for contingent or unforeseen liabilities or obligations of the Company (which reserves when they become unnecessary shall be distributed in accordance with the provisions of clause (iii), below); and

(iii) Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

8.3 *Deficit Restoration/Liability.* Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of Dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's Termination.

SECTION 9
GENERAL PROVISIONS

9.1 *Meetings.* Meetings of the Members may be called as provided in this Agreement as well as by the Managers. Any action of the Members may be taken by written consent of that number or percentage of the Members whose consent is otherwise required for such action under this Agreement.

9.2 *Entire Agreement.* This Agreement and the attached *Schedule A* contains the entire understanding among the Members, and supersedes any prior written or oral agreement between them, with respect to the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement.

9.3 *Amendments.*

(a) Except as otherwise provided in this Section 9.3, this Agreement may be amended, in whole or in part, only through a written amendment executed by the Members whose aggregate Allocation Percentages equal or exceed seventy five percent (75%) of the total Allocation Percentages of all the Members.

(b) Notwithstanding the foregoing provisions of this Section 9.3, the Managers may, without the consent of the other Members, amend this Agreement to the minimum extent necessary as determined by the Managers to comply with applicable law, supply a missing term or provision, or resolve an ambiguity in the existing terms and provisions of this Agreement or to preserve the economic arrangement of the Members.

(c) For the convenience of the Members, the Managers are hereby authorized to execute and deliver on behalf of the Members a restated operating agreement of the Company that is identical to this Agreement as amended by all duly adopted amendments hereto.

-19-

CONFIDENTIAL

9.4 *Counterparts; Binding upon Members.* This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart. An electronic copy, photocopy or facsimile copy of this Agreement shall have the same effect and may be accepted with the same authority as the original.

9.5 *No Third Party Beneficiaries.* The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to (a) enforce or demand enforcement of a Member's Capital Commitment, obligation to return distributions, or obligation to make other payments to the Company as set forth in this Agreement or (b) demand that the Company or the Managers issue any capital call.

9.6 *Notices, Consents, Elections, Etc.*

(a) Subject to the provisions of Section 9.4, all notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company. For purposes of the following provisions of this Section 9.6, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

(b) Any notice, required or permitted under this Agreement must be in writing and (i) delivered personally, (ii) sent by certified or registered mail, postage prepaid, return receipt requested, or (iii) sent by electronic mail. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. A notice that is sent by electronic mail may be addressed to the email address listed on Exhibit A, or otherwise recognized as the electronic mail address of such party, and will be deemed given on the day that such transmission is completed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.7 *Severability.* In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

9.8 *Governing Law; WAIVER OF JURY TRIAL.* The interpretation and enforceability of this Agreement and the rights and liabilities of the Members as such shall be governed by the laws of the State of Delaware as such laws are applied in connection with limited liability company operating agreements entered into and wholly performed upon in Delaware by residents of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law. EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS DOCUMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS

-20-



REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

9.9   *Timing.*  All dates and times specified in this Agreement are of the essence and shall be strictly enforced.  Except as otherwise specifically provided in this Agreement, and except with regard to distributions made by the Company, all actions that occur after the Close of Business on a given day shall be deemed for purposes of this Agreement to have occurred at 9:00 a.m. on the following day. In the event that the last day for the exercise of any right or the discharge of any duty under this Agreement would otherwise be a day that is not a business day, the period for exercising such right or discharging such duty shall be extended until the Close of Business on the next succeeding business day.

9.10   *Partnership for Tax Purposes Only.*  As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act.  The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

9.11   *Dispute Resolution.*

(a)  *Form and Venue.*   Except as otherwise specifically provided in this Agreement, any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon an award arising in connection therewith may be entered in any court of competent jurisdiction.   Any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be held in New York County, New York, or, if such proceeding cannot be lawfully held in such location, as near thereto as applicable law permits.

(b)  *Fees and Costs.*  The prevailing party or parties in any arbitration, mediation, court action or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys, accountants and experts fees and related expenses (including reasonable charges for in-house legal counsel and related personnel) and for the costs of such proceeding.  In the event that two or more parties are deemed liable for a specific amount payable or reimbursable under this Section 9.11(b), such parties shall be jointly and severally liable therefore.

9.12   *Miscellaneous.*  This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*Signature Page to Follow*

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the Effective Date.

MEMBER                                    MEMBER

ONSLOT FILMS LLC                          SPM HOLDINGS 2012, LLC

-21-

CONFIDENTIAL

SM_000374

Ben Patterson
President

Barry R. Bekkedam
Manager

-22-

CONFIDENTIAL

SM_000375

SCHEDULE A

MEMBER INFORMATION

October 30, 2013

| Name and Contact Information | Allocation Percentage |
|---|---|
| Class A | 50% |
| Onslot Films LLC<br>347 West 36th Street, Suite 1103<br>New York, NY 10018<br>Phone: (212) 380-7672<br>Email: ben@onslot.net | |
| Class B | 50% |
| SPM Holdings 2012, LLC<br>3601 PGA Boulevard, Suite 220<br>Palm Beach Gardens, FL 33410<br>Phone: 561-345-3895<br>Email: brb@crudenbaypartners.com | |
| Total: | 100% |

-23-

CONFIDENTIAL                    SM_000376